# Third District Court of Appeal

## State of Florida

Opinion filed September 6, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-0001
Lower Tribunal No. 12-41600
_____

**John M. Bennett and Nancy L. Bennett,**
Appellants,

vs.

**Mortgage Electronic Registration Systems, Inc., Home Loan Alliance, LLC f/k/a Leverage Financial, LLC d/b/a LF Loans, Jamal M. Wilson, and GTE Federal Credit Union,**
Appellees.


An Appeal from the Circuit Court for Miami-Dade County, Michael Hanzman, Judge.

Rex E. Russo, for appellants.

Scott Jay Feder, P.A. and Scott Jay Feder, for appellees.

Before SALTER, FERNANDEZ and LUCK, JJ.

LUCK, J.

The ancient Greek playwright Sophocles asked in one of his best known dramas, Antigone, "what prowess is it to slay the slain anew?"[1] (Nowadays we

would ask, "why beat a dead horse?") Congress must have had Sophocles in mind when it drafted the truth-in-lending act. Section 1640(b) of the act shields creditors from liability if they fix disclosure errors and pay back debtors within sixty days of discovering the error. Why allow a federal cause of action where the clerical error has been timely corrected?

John and Nancy Bennett sued Mortgage Electronic Registration System, Inc., LF Loans, LF Loan's president, Jamal Wilson, and GTE Federal Credit Union for fraud, declaratory relief, and violating the truth-in-lending act because the defendants failed to disclose at closing that the Bennetts would have to pay for private mortgage insurance as part of the refinance on the couple's home. Because there was no genuine issue of material fact that the defendants fixed the mortgage insurance discrepancy and paid back the Bennetts for the premiums they paid within sixty days of discovering the error, there was no liability under the truth-in-lending act, no damages for fraud, and no present need for declaratory relief. We, therefore, affirm the trial court's summary judgment for the defendants.

*Factual Background and Procedural History*

In April 2012, the Bennetts were looking for assistance to refinance the mortgage on their home. They learned of a government program, the Home Affordable Refinance Program, intended to assist borrowers whose mortgages

---

[1] http://www.monologuearchive.com/s/sophocles_006.html.

exceeded the value of their home. The Bennetts completed a loan application with their broker, Advance Mortgage. With the assistance of their broker, on April 17, 2012, they applied for a HARP II loan from LF Loans. The truth-in-lending act disclosure statement attached to the application form estimated a monthly payment of $1,345.68, which included $237.60 in escrow for taxes, property insurance, and private mortgage insurance. The loan was closed on June 12, 2012 by Stewart Title Company, at which time the Bennetts initialed and signed several documents, including a payment letter and an initial escrow account disclosure statement. At closing, the estimated monthly payment was $1,237.96 and did not include private mortgage insurance.

After closing, the Bennetts' loan was assigned to GTE Federal Credit Union. Prior to the first payment due in August 2012, the Bennetts received a monthly payment statement from GTE. Mr. Bennett noticed that the monthly payment listed on the statement was less than the estimated monthly payment he received at closing. Mr. Bennett called GTE to avoid future issues with the loan. A few days later GTE called back and told Mr. Bennett the correct payment amount; however, this time the amount was greater than the amount he was told at closing. Mr. Bennett asked GTE to send him a copy of the documents he signed agreeing to the higher payment. Within a week he received several documents, including a payment letter and initial escrow account disclosure statement, which the Bennetts

3

contend were forgeries. Unlike the Bennetts' copies of the closing documents, the documents sent to Mr. Bennett by GTE included a $100.92 charge for private mortgage insurance.

On July 10, 2012, the Bennetts' counsel sent a demand letter to GTE with copies to LF Loans and Stewart Title. The letter informed GTE: of the discrepancy; the Bennetts had no obligation to pay private mortgage insurance on the loan; and the Bennetts would be paying the insurance under protest until GTE corrected its records. The letter also stated:

> we demand that this matter be fully rectified within 60 days. Failure to fully rectify this matter within that time will lead to the filing of legal action. In order to fully rectify this matter you must not only correct your Loan Statement and purge all the fraudulent documents in order to avoid a repetition of the fraud through further transfer of the mortgage instruments, but you must also pay compensation for fees and costs suffered by the borrowers, as well as credit back to them the overpayments for the improperly charged PMI.
>
> To date the borrowers attorney's fees paid are $200.00 with an anticipated additional amount of $300.00 to become due. Accordingly, you should issue a payment or credit to the borrowers of $200 and a send a separate check for $300 payable to me . . . .

On July 16, 2012, LF Loans electronically mailed the Bennetts' counsel the following message:

> The issue with the documents being falsified lies at the feet of the title company. We sent out a final package with [private mortgage insurance] on all loan documents. I don't have corroboration from the title company but my thought process is that they mistakenly got the initial documentation signed realized the error and transposed the necessary docs including 1st payment letter. . . .

I am uncertain as to why those parties chose to take action resulting in misrepresentation. However, this loan indeed has [private mortgage insurance] due to the fact that [mortgage insurance] has to be transferred on all HARP loans during the refinance process. I am also attaching a signed 1033 and [Truth-in-Lending disclosure] from the borrower showing [private mortgage insurance] was initially disclosed on this loan, making your client aware of [private mortgage insurance] in this transaction. . . .

Unfortunately due to the nature of HARP loans we are unable to remove [private mortgage insurance] from this loan and do need to have these items re[-]signed. . . .

On July 19, 2012, the Bennetts' counsel responded by electronic mail that his clients would not be re-signing anything because they had no legal obligation to do so and if proper disclosures had been made the Bennetts might have opted not to enter into the home refinance. The message threatened legal action for fraud.

Eleven days later, LF Loans said, by electronic mail, the private mortgage insurance would be taken off the loan and any insurance payments the Bennetts made would be refunded. On October 17, 2012, GTE sent the Bennetts the first of the new monthly payment statements which did not include private mortgage insurance, and the following month, GTE refunded the $302.76 the Bennetts had paid under protest for the August, September and October 2012 insurance amounts.

On October 23, 2012, three months after the mortgage insurance issue was resolved, the Bennetts filed their initial complaint against LF Loans, its principal, GTE, and MERS, which held the legal title to the mortgage. Two complaints, and four years later, the Bennetts second amended complaint alleged forgery as to LF Loans and its principal (count one); declaratory relief against MERS and GTE (count two); and a truth-in-lending act violation against all the defendants (count three).

The defendants moved for summary judgment because the Bennetts suffered no damages as a result of the alleged forgery after the private mortgage insurance payments were removed and refunded; there was no pending dispute between the parties warranting declaratory relief; MERS could not be held liable for truth-in-lending act violations; and the disclosure errors were cured within the truth-in-lending act's sixty-day window to correct errors. The trial court granted summary judgment, and this appeal followed.[2]

*Standard of Review*

---

[2] With their appeal, the Bennetts also filed a petition for writ of certiorari seeking review of the trial court's order determining the defendants were entitled to attorney's fees based on section 57.105 of the Florida Statutes. At oral argument, the Bennetts abandoned their petition in favor of a direct appeal in case number 17-1254 of the trial court's judgment awarding section 57.105 fees, which remains pending. We, therefore, do not address the defendants' entitlement to section 57.105 fees.

"The standard of review for summary judgment is de novo. Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Alvarez-Mejia v. Bellissimo Props., LLC, 208 So. 3d 797, 798-99 (Fla. 3d DCA 2016) (citations omitted).

*Discussion*

The Bennetts contend the trial court erred in granting summary judgment for the defendants because (1) they had a right to rescind the mortgage under the truth-in-lending act; (2) there were disputed issues of fact that the closing documents were forged; and (3) the potential of the forged documents in the loan file being transferred to another lender precluded summary judgment on the declaratory relief claim. We will address each of these contentions below.

## 1. The Truth-in-Lending Act Claim

The Bennetts claimed they were entitled to rescind the mortgage and statutory penalties under the truth-in-lending act because the defendants charged them for private mortgage insurance that was not disclosed as a finance charge at closing. Indeed, the truth-in-lending act requires lenders to disclose any "finance charge" associated with the mortgage. 12 C.F.R. § 1026.18(d). A "finance charge" is any money payable by the borrower and imposed by the lender, as a condition of receiving the loan, and includes "[p]remiums or other charges for any

7

guarantee or insurance protecting the creditor against the consumer's default or other loss." Id. § 1026.4(a), (b)(5).

The finance charges as part of the mortgage, including any charges for private mortgage insurance, must be disclosed "before consummation of the transaction," that is, before the closing. Id. § 1026.17(b). Failing to disclose finance charges, like for mortgage insurance, may be a violation of the truth-in-lending act and subject the lender to statutory penalties or rescission of the mortgage. See, e.g., Madel v. GMAC Mortgage Corp. (In re Madel), No. 03-32367, 2004 WL 4055247, at *8 (Bankr. E.D. Wis. Nov. 8, 2004) ("Improper disclosure of the amount of the finance charge is a material violation for purposes of rescission.").

The act, however, provides a safe harbor for lenders that correct failures to disclose finance charges within sixty days of being notified of the error.

> A creditor or assignee has no liability under this section . . . for any failure to comply with any requirement imposed under this part or part E, if within sixty days after discovering an error . . . and prior to the institution of an action under this section or the receipt of written notice of the error from the obligor, the creditor or assignee notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed . . . .

15 U.S.C. § 1640(b).

Here, there was no genuine dispute that on July 10, 2012 the Bennetts' counsel notified the defendants that the August 2012 statement included private mortgage insurance that had not been disclosed at the time of closing. Three weeks later, on July 31, LF Loans responded that private mortgage insurance would be removed from future statements consistent with the closing documents and the money the Bennetts paid for private mortgage insurance would be refunded. Three months after that, on October 23, the Bennetts sued under the truth-in-lending act.

The defendants discovered the error when they got the call from the Bennetts and received their attorney's letter on July 10. Within sixty days of discovering the error, by July 31, and prior to the filing of the couple's lawsuit, the defendants notified the Bennetts that there was indeed an error on the statement and it would be adjusted to reflect what had been disclosed at closing about private mortgage insurance. The defendants refunded the money the Bennetts overpaid and corrected the statements. Pursuant to the section 1640(b) safe harbor, the defendants have "no liability" for the failure to disclose the mortgage insurance finance charge.

The Bennetts' rescission claim, moreover, is precluded by section 1635(e). The rescission remedy does not apply to a "refinancing" of the same home. Id. § 1635(e)(2); see also Kucera v. Citizens Bank & Tr. Co., 754 F.2d 280, 281 (8th

9

Cir. 1985) ("[E]ven if the loans were secured by the Kuceras' principal residence, the seven refinancing transactions are exempt from coverage under the right-of-rescission."). There is no genuine dispute that the Bennetts' 2012 mortgage was a refinance of their existing mortgage, secured by an interest in the same residential home.

Finally, the trial court properly granted summary judgment on the Bennetts' truth-in-lending act claim as to MERS because "MERS is neither a creditor nor assignee as defined by [the truth-in-lending act]." Cannon v. U.S. Bank, NA, No. CIV. 11-00079 HG-BMK, 2011 WL 2117015, at *5 (D. Haw. May 24, 2011). The act's disclosure requirements only apply to creditors and assignees and MERS is neither as defined by Congress and the federal regulators.

## 2. Forgery Claim

The Bennetts also alleged that LF Loans and its principal committed forgery. "Forgery exists under Florida law where the defendant makes a writing which falsely purports to be the writing of another, made with the intent to injure or defraud any person. The instrument in question must have some legal efficacy." Schauer v. Gen. Motors Acceptance Corp., 819 So. 2d 809, 814 (Fla. 4th DCA 2002) (quotation omitted). And, as with any kind of fraud, resulting damages to the plaintiff are an essential element.[3] Poliakoff v. Nat'l Emblem Ins. Co., 249 So.

---

[3] As the Bennetts explain in their initial brief, "[f]orgery is recognized as a species of fraud in Florida." (Initial Br. at 38.)

10

2d 477, 478 (Fla. 3d DCA 1971) (The essential elements of fraud are . . . resulting damage to the plaintiff.").

The summary judgment evidence, with every inference made in favor of the Bennetts, showed that they did not suffer damages as a result of the forged/fraudulent documents. The Bennetts, on July 10, 2012, informed the defendants about the "fraudulent documents" and asked that the payment statements be amended to reflect the agreement at closing, which did not include private mortgage insurance, and to refund any overpayments. Six days later, LF Loans acknowledged the "falsified lies" and "misrepresentation[s]," and on July 31, agreed to remove the insurance requirement from the mortgage, issue new statements, and refund the money. Within twenty one days, that is, the Bennetts got everything they wanted (other than attorney's fees).

Still, three months later, the Bennetts sued the defendants for forgery. By then, however, the result of the forged documents – having to pay private mortgage insurance – had been fixed, and LF Loans had promised to amend the loan statements and refund overpayments. By October 23, when the initial complaint was filed, the Bennetts were not required to pay the insurance, even assuming LF Loans and its principal forged the loan documents. Without damages, summary judgment was due to be granted on the forgery/fraud claim. See Sussex Mut. Ins. Co. v. Gabor, 568 So. 2d 1004, 1005 (Fla. 3d DCA 1990) (affirming summary

judgment because "on this record, it is clear that the plaintiff suffered no damages on its fraud and related claims").

### 3.  Declaratory Relief Claim

The Bennetts' final claim was for a declaration that the private mortgage insurance on their statement was null and void because it was based on forged documents.  "The elements of an action seeking a declaratory judgment require the plaintiff to show there is [1] a bona fide adverse interest between the parties concerning a power, privilege, immunity or right of the plaintiff; [2] the plaintiff's doubt about the existence or non-existence of his rights or privileges; [3] that he is entitled to have the doubt removed."  Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP, 137 So. 3d 1081, 1093 (Fla. 3d DCA 2014).

In this case, there was no genuine dispute that there was no bona fide adverse interest.  The Bennetts, on July 10, 2012, gave the defendants sixty days' notice to cure the forged documents and the assessment of private mortgage insurance contrary to what had been disclosed at closing.  Within three weeks, the defendants acknowledged that the disputed documents were "falsified" and "misrepresentation[s]," and agreed to remove the private mortgage insurance payments consistent with the closing documents, revise the statements, and return the overpaid money.  When summary judgment was granted, and even by the time

12

the complaint was filed, there was no dispute between the parties about the documents and whether the Bennetts were required to pay for mortgage insurance.

The Florida Supreme Court handled a similar case in <u>Santa Rosa County v. Administration Commission</u>, 661 So. 2d 1190 (Fla. 1995). There, a county and the state department of community affairs had a dispute about the county's proposed comprehensive plan. <u>Id.</u> at 1191. The dispute resulted in two lawsuits – one in front of the division of administrative hearings and the other in the circuit court for declaratory and injunctive relief. <u>Id.</u> The parties settled the administrative action, and the department of community affairs moved for summary judgment in the declaratory relief case because there was "no present need for a declaratory judgment." <u>Id.</u> at 1192. The trial court granted the motion because "[t]he [s]ettlement [a]greement resolved the dispute between the parties as to the particular facts alleged in the complaint," and therefore, there was "no longer . . . a bona fide, present need for the declaration." <u>Id.</u> (quoting trial court's order on rehearing). The Florida Supreme Court agreed that "all disputes between the parties were resolved by the stipulated settlement agreement . . . . [B]ecause there was no pending controversy, the Declaratory Judgment Act was no longer available" to the county. <u>Id.</u>

There is even less of a "present" controversy in this case. The dispute between the Bennetts and the defendants – whether the Bennetts were wrongly

13

charged for mortgage insurance – was resolved months before the initial complaint was filed, and years before summary judgment was entered. The Bennetts (other than attorney's fees) received everything they had asked for by October 2012. As in the Santa Rosa County case, there was no need to slay the slain.

## *Conclusion*

There being no truth-in-lending act liability, no fraud damages, and no present controversy, the trial court properly granted summary judgment for the defendants. We, therefore, affirm.

Affirmed.